Filed 1/28/21  P. v. Bull CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>JOSHUA J. BULL,<br><br>  Defendant and Appellant. | B295558<br><br>(Los Angeles County<br>Super. Ct. No. KA114447) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ruben N. Garcia, Judge.  Affirmed.

Shannon Chase, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Acting Senior Assistant Attorney General, Idan Ivri and Nancy Lii Ladner, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

## INTRODUCTION

Joshua Jelani Bull appeals from a judgment after a jury convicted him of two counts of battery with serious bodily injury (Pen. Code, § 243, subd. (d)),[1] one count of misdemeanor battery of a police officer (§§ 242, 243, subd. (b)), and one count of second degree murder (§ 187, subd. (a)). Bull argues that he was denied effective assistance of counsel because his counsel failed to request pretrial mental health diversion under section 1001.36. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In an information filed on November 15, 2017, the Los Angeles County District Attorney charged Bull with two counts of battery with serious bodily injury (§ 243, subd. (d); counts 1 and 2), one count of misdemeanor battery of a police officer (§§ 242, 243, subd. (b); count 3), one count of misdemeanor battery (§ 242; count 4), and one count of murder (§ 187, subd. (a); count 5). On November 26, 2018, the District Attorney filed an amended information adding a hate-crime allegation as to counts 1, 2, and 5 (§ 422.75, subd. (a)). On November 27, 2018, the trial court dismissed count 4 in the furtherance of justice (§ 1385).

A. *Evidence at Trial*

1. *The January 26, 2017 Incidents*

On the morning of January 26, 2017, without warning, Bull punched Jose Mendoza in the face while Mendoza was walking down the street. Bull walked away leaving Mendoza dizzy and bleeding from a cut to his nose. After taking a few steps and sitting down, Mendoza observed Bull continue to walk down the

---

[1] Undesignated statutory references are to the Penal Code.

street.  According to Mendoza, moments after punching him, Bull encountered Jessie Ayala on the street and began punching him. Mendoza testified:  "[Bull] was swinging at [Ayala] rapidly, like, not stopping.  [Ayala] was standing, not going to fight him, and [Bull] was, like, just swinging at [Ayala].  [Bull] just couldn't stop; so [Ayala], like, backed away, and then [Bull] started chasing after [Ayala]."  After tripping, Ayala "landed on his face or head" in the street.  According to Mendoza, "[Ayala] was on the floor, cold.  That's when [Bull] was punching him, socking him, hitting him, stomping on him, saying, "Fuck Mexicans."  [Bull] spit on him. . . .  [Ayala] was out cold."  Mendoza testified that Bull stomped on Ayala's head "two times" and punched him "seven or eight times," while Ayala was unconscious on the ground.  Bull walked away leaving Ayala unconscious and bleeding from his head.  Police officer Tim Ugarte found Ayala unconscious and bleeding profusely from his head injuries.

Bull encountered another unidentified man nearby.  Police officer Jesus Garcia, while on patrol, observed Bull "swinging at" the unidentified man and the unidentified man defensively swinging at Bull.  After Garcia "honked an air horn on the police car," Bull "started running across the street."  After Garcia chased Bull, Bull surrendered.  Because "[Bull] had a hard time breathing," Garcia called an ambulance to transport Bull to a hospital for evaluation.

Later in the afternoon, after a physician medically cleared Bull for discharge from the hospital, while in a police car and with hands cuffed behind his back, Bull spit on a police officer and tried to kick him.  Bull appeared to cry and laugh while being transported from the hospital to the police station.  At the

police station, Bull kicked a police officer when the police attempted to remove Bull from the police vehicle.

Ayala suffered "traumatic brain injury," "multiple facial fractures," "several brain injuries, several different types of bleeds, and several strokes." Ayala "had injury upon injury upon injury on his brain." Ayala remained hospitalized until he died on May 19, 2017. The Los Angeles County Department of Medical Examiner-Coroner determined that Ayala's "cause of death [was] the effect of blunt force trauma to the head." Mendoza received seven or more stiches to his face from his injury. Bull did not know Mendoza or Ayala.

### 2. *Defense Case*

#### a. *Bull's testimony*

Bull testified that he has been told he has "schizophrenia" and has "always dealt with depression." Bull also testified that, before the January 2017 attacks, mental health professionals diagnosed him with a delusional disorder and paranoid schizophrenia, and as psychotic. He stated that he first began experiencing hallucinations and "constant" voices in his head in 2016, and was placed on two "5150 hold[s]" in 2016.[2] Regarding

---

[2]    Welfare and Institutions Code section 5150, subdivision (a), provides: "When a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, professional person in charge of a facility designated by the county for evaluation and treatment . . . may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for

the 5150 hold in May 2016, Bull testified: "They said that I was paranoid and I tried to lock my family in the house because I thought some people were after us." Regarding his second 5150 hold in July 2016, Bull explained, "They said I went to [Los Angeles Mayor Eric Garcetti's] house and said I was there to meet Donald Trump and Mayor Garcetti." As a result of each 5150 hold, physicians prescribed medications for Bull.

Bull testified that his delusions were "like people constantly harassing [him]." In general, those voices make him feel "depressed" or "angry." According to Bull, at the time of his encounters with Mendoza and Ayala, the voices told him that he was "in danger," although he did not recall anything specific about what the voices told him. Bull testified that, on the day of the incidents, he had used marijuana and "may have been" under the influence of methamphetamine. He was not taking any medication in January 2017. Bull testified that he had never met Ayala or Mendoza.

According to Bull, the fight with Ayala "just felt like it was mutual." After they "bumped into each other" on the street, "we kind of faced off and [Bull] thought [he] was in danger. And then we started fighting." Bull felt in danger because "[Ayala] just looked angry, and [Ayala] looked like the type that would want to fight. So that's what happened." Bull testified that Ayala swung at him, but he did not recall who threw the first punch. Bull also testified that Ayala looked like "a Hispanic gangster" because "he was bald and he looked like one." Bull "hit [Ayala] and he fell and hit his head." Bull testified that "[Ayala] was knocked out

---

evaluation and treatment and approved by the State Department of Health Care Services."

5

[in the street]. And I noticed he was hurt, and I left." Bull understood that he caused Ayala's death and was "sorry that that happened." The voices in Bull's head did not tell him to assault Ayala.

Although Bull testified that he had no memory problems, Bull did not remember "anything whatsoever" about his interaction with Mendoza. On the day of the incident, Bull's "drug screen was positive for methamphetamine and cannabis." Since he was incarcerated in January 2017, Bull had been taking Zyprexa every day for "hearing voices and hallucinations." Bull testified that the medication helps "somewhat."

### b. *Dr. Kojian's testimony*

Forensic psychologist, Dr. Haig Kojian, testified that, based on his review of records and his interview with Bull, Bull "was in . . . a mentally decompensated condition at the time of the incident." According to Dr. Kojian, Bull "was in an altered mental state" while Bull was in the hospital on January 26, 2017. Based on a review of records from the 5150 hold in July 2016, Dr. Kojian testified that Bull "was talking to himself. Laughing to himself. And had a very well-established delusional belief that did he have this meeting with Mayor Garcetti and Donald Trump, or something like that. . . . There was also information in the record to show that he was paranoid. He mentioned something about the Mexican mafia was after him, and that he was trying to protect himself from them." According to Dr. Kojian, in July 2016 during Bull's 5150 hold, a mental health professional diagnosed Bull with "schizoaffective disorder and delusional." Dr. Kojian defined "schizoaffective [as] a combination of schizophrenia and an affective condition, either depression or mania. And so you're on the schizophrenia

6

spectrum. And so it's a severe mental illness. It's a psychosis type of mental illness." Dr. Kojian formed the opinion that Bull "could have been suffering from paranoia" on January 26, 2017. Dr. Kojian did not review the records from Bull's first 5150 hold in May 2016.

Bull told Dr. Kojian that he lost his temper on January 26, 2017 and that "he hadn't taken any drugs" that day. Bull specifically told Dr. Kojian that "he did not take" methamphetamine. Bull also told Dr. Kojian that "he was hearing voices" on January 26, 2017 "to attack them." During his interview with Bull, there was nothing to indicate that Bull was not focused, paying attention, or listening carefully. Dr. Kojian did not observe any evidence of psychosis, and Bull's thinking was clear, linear, and goal directed.

B.      *Jury Verdict and Sentencing*

The trial occurred in November 2018. On November 29, 2018, the jury found Bull guilty of two counts of battery with serious bodily injury (§ 243, subd. (d); counts 1 and 2), one count of misdemeanor battery of a police officer (§§ 242, 243, subd. (b); count 3), and one count of second degree murder (§ 187, subd. (a); count 5). The jury found not true the hate-crime allegations. On January 25, 2019, the trial court sentenced Bull to 18 years to life in prison. Bull timely appealed.

## DISCUSSION

A.      *Bull's Ineffective Assistance of Counsel Claim Should Be Presented in a Petition for Writ of Habeas Corpus*

1.      *Applicable Law*

a.      *Mental health diversion*

Effective June 27, 2018, "the Legislature enacted sections

7

1001.35 and 1001.36 as part of Assembly Bill No. 1810 (2017-2018 Reg. Sess.) . . . . [Citation.] Section 1001.36 gives trial courts the discretion to grant pretrial diversion for individuals suffering from certain mental health disorders. (§ 1001.36, subd. (a).)" (*People v. Frahs* (2020) 9 Cal.5th 618, 626 (*Frahs*).) "The stated purpose of the diversion statute 'is to promote all of the following: [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings. [¶] (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders.' (§ 1001.35, subds. (a)-(c).)" (*Frahs*, at p. 626.)

Section 1001.36 defines "pretrial diversion" as "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment . . . ." (§ 1001.36, subd. (c).) If a defendant is charged with a qualifying offense, a trial court may grant pretrial diversion if it finds all of the following: (a) the defendant suffers from a qualifying mental disorder; (b) the mental disorder was a significant factor in the commission of the charged offense; (c) in the opinion of a qualified mental health expert, the defendant's symptoms will respond to mental health treatment; (d) the defendant consents to diversion and waives his or her right to a speedy trial; (e) the defendant agrees to comply with treatment as a condition of diversion; and (f) the defendant will not pose an unreasonable risk of danger to public safety if

8

treated in the community. (*Id*., subds. (b)(1)(A)-(F).)

If the six criteria in section 1001.36, subdivision (b)(1), are met, and if the trial court "is satisfied that the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant" (§ 1001.36, subd. (c)(1)(A)), the court may order diversion into an approved mental health treatment program for up to two years (*Id*., subds. (c)(1) & (3)). If the defendant commits an additional offense or otherwise performs unsatisfactorily in the diversion program, the court may reinstate the criminal proceedings. (*Id*., subd. (d).) "If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion," and "the arrest upon which the diversion was based shall be deemed never to have occurred . . . ." (*Id*., subd. (e).)

As originally enacted, section 1001.36 applied to all defendants, including those charged with murder. (*Frahs, supra,* 9 Cal.5th at p. 626.) However, on September 30, 2018, section 1001.36 was amended effective January 1, 2019 "to specify that defendants charged with certain crimes, such as murder and rape, are ineligible for diversion." (*Frahs,* at pp. 627, 635; see § 1001.36, subd. (b)(2), stats. 2018, ch. 1005, § 1, pp. 6635-6638.) Thus, for the period from June 27, 2018 to December 31, 2018, section 1001.36 did not exclude a defendant charged with murder from eligibility for mental health diversion. In *Frahs, supra*, 9 Cal.5th 618, the Supreme Court held that section 1101.36 "applies retroactively to cases in which the judgment is not yet final. . . ." (*Id.* at pp. 624, 637.)

9

### b. *Ineffective assistance of counsel*

To establish ineffective assistance of counsel, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and counsel's deficient performance was prejudicial, that is, there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*People v. Rices* (2017) 4 Cal.5th 49, 80; *People v. Mickel* (2016) 2 Cal.5th 181, 198; *People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.)

"On direct appeal, if the record "'sheds no light on why counsel acted or failed to act in the manner challenged,'" we must reject the claim "'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.'"" (*People v. Caro* (2019) 7 Cal.5th 463, 488; accord, *People v. Bell* (2019) 7 Cal.5th 70, 125 ["'[u]nless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy"'"]; *People v. Mickel*, *supra*, 2 Cal.5th at p. 198 ["a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ""no rational tactical purpose"" for an action or omission"].) Accordingly, "except in those rare instances where there is no conceivable tactical purpose for counsel's actions, claims of ineffective assistance of counsel should be raised on habeas corpus, not on direct appeal." (*People v. Lopez* (2008) 42 Cal.4th 960, 972; see *People v. Carrasco* (2014) 59 Cal.4th 924, 980-981 ["[u]sually, ineffective assistance of counsel claims are properly

10

decided in a habeas corpus proceeding rather than on appeal"]; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 [appellate court should not find ineffective assistance of counsel unless all facts relevant to that claim have been developed in the record]; *People v. Avena* (1996) 13 Cal.4th 394, 419 ["'[w]here the record does not illuminate the basis for the challenged acts or omissions, a claim of ineffective assistance is more appropriately made in a petition for habeas corpus'"], italics omitted.)

### 2. *Bull Has Not Met His Burden To Show Ineffective Assistance of Counsel*

Bull argues that he "was denied his Sixth Amendment Constitutional Right to effective assistance of counsel due to defense counsel's failure to seek pretrial diversion based on uncontradicted evidence that [Bull] was diagnosed with a qualifying mental health condition at the time of the incident, his actions were due to that mental health condition, and where [Bull] appeared to be successfully treated with medication." Bull further argues, "[D]efense counsel's failure to request 1001.36 pretrial mental health diversion, with the possibility of charges being dismissed, at a time when section 1001.36 applied to murder, was deficient performance. Could counsel make a valid tactical decision to go to trial and present a weak voluntary manslaughter defense to murder, where at best, the sentence for that charge alone would be three, six, or 11 years?"

### a. *Deficient performance*

We do not know why Bull's counsel did not seek pretrial mental health diversion. Certainly, "a defense attorney who fails to adequately understand the available sentencing alternatives, promote their proper application, or pursue the most advantageous disposition for his client may be found

11

incompetent." (*People v. Scott* (1994) 9 Cal.4th 331, 351.) However, while it is possible that defense counsel's failure to request diversion was due to ignorance of the diversion statute enacted in June 2018, it is at least plausible that valid reasons existed for not seeking pretrial diversion. For example, Bull may not have consented to mental health diversion (see § 1001.36, subd. (b)(1)(D) ["[t]he defendant consents to diversion"]) and would have insisted on going to trial based on his belief that the altercation with Ayala was "mutual." (See *In re Alvernaz* (1992) 2 Cal.4th 924, 936 ["a defendant possesses a constitutionally protected right to participate in the making of certain decisions which are fundamental to his or her defense"].) On the present record, we do not know whether counsel discussed pretrial diversion with Bull.

Bull's counsel may also have determined that there was insufficient evidence to support one or more of the requirements for mental health diversion. There also could be other reasons that reasonably led Bull's counsel to conclude that the trial court would have ruled that Bull was ineligible for mental health diversion. "Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable." (*People v. Mickel*, *supra*, 2 Cal.5th at p. 198.) Nor has Bull shown "affirmative evidence that counsel could have had 'no rational tactical purpose' for these decisions." (*Id.* at p. 200.) Accordingly, Bull's claim is more appropriately decided in a habeas corpus proceeding. (*People v. Gray* (2005) 37 Cal.4th 168, 211 [rejecting claim of ineffective assistance of counsel because it "is more appropriately raised in a petition for a writ of habeas

12

corpus"]; *People v. Jones* (2003) 29 Cal.4th 1229, 1263 [issues requiring review of matters outside the record are better raised on habeas corpus rather than on direct appeal]; (*People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267 [a claim of ineffective assistance of counsel relating to ""why counsel acted or failed to act in the manner challenged" is more appropriately decided in a habeas corpus proceeding"].)

       b.    *Prejudice*

Even if Bull could satisfy the first prong of the test for ineffective assistance of counsel, he cannot show that he """"suffered prejudice to a reasonable probability."""" (*People v. Johnson* (2016) 62 Cal.4th 600, 653.) As the California Supreme Court has observed, a reviewing court "'need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" (*People v. Carrasco, supra,* 59 Cal.4th at p. 982; accord, *Strickland v. Washington*, *supra*, 466 U.S. at p. 697.) When the ineffective assistance claim is based on the defense counsel's failure to make a motion, the defendant must demonstrate not only that the motion would have been meritorious, but also that it is reasonably probable that absent the omission, a determination more favorable to the defendant would have resulted. (*People v. Mattson* (1990) 50 Cal.3d 826, 876-877; *People v. Gonzalez* (1998) 64 Cal.App.4th 432, 438.)

On the present record, Bull has not shown that he could have satisfied the requirements for mental health diversion. Dr. Kojian did not offer opinions regarding the section 1001.36

requirements.  For example, Dr. Kojian was not asked to opine whether Bull would "not pose an unreasonable risk of danger to public safety . . . if treated in the community."  (§ 1001.36, subd. (b)(1)(F).)  Nor was there evidence that any mental disorder was "a significant factor" in Bull's attacks on Ayala and Mendoza. (*Id.*, subd. (b)(1)(B).)  Dr. Kojian testified that on the day of the attacks Bull "was again in a mental decompensated state." However, as required by section 1001.36, Dr. Kojian did not connect a "mental disorder" to the attacks on January 26, 2017.[3] Further, there was no "opinion of a qualified mental health expert" that Bull's symptoms of mental health disorder "motivating the criminal behavior would respond to mental health treatment."  (*Id.*, subd. (b)(1)(C).)  Bull's argument that "[w]hen [Bull] receives proper care, he apparently responds favorably and is nonviolent"  is speculative.  As the People point out, Dr. Kojian testified that "delusions are difficult to treat."

Bull has not established that he could have prevailed on a pretrial diversion request.  Therefore, Bull failed to sustain his burden on prejudice.  (*In re Alvernaz, supra,* 2 Cal.4th at p. 945 ["even if counsel's performance was deficient, petitioner has failed to sustain his burden on the issue of prejudice"]; *People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267 [appellate court should not find ineffective assistance of counsel unless all facts relevant to that claim have been developed in the record]; see

---

[3]     In *Frahs*, *supra*, 9 Cal.5th 618, the Supreme Court held that the defendant supported section 1001.36's first threshold eligibility requirement because "[a] clinical and forensic psychologist testified that defendant suffers from a qualifying mental disorder [citation], and opined that his behavior at the [crime scene] was a consequence of this disorder."  (*Id.* at p. 640.)

14

generally *People v. Caro* (2019) 7 Cal.5th 463, 489 [where defendant "fail[ed] to establish that a motion to suppress [evidence] would have been meritorious," he could not show his counsel was ineffective in failing to bring such motion]; *People v. Bell*, *supra*, 7 Cal.5th at p. 126 ["[a] decision not to pursue futile or frivolous motions does not make an attorney ineffective"].)

In sum, Bull's claim of ineffective assistance of counsel is more appropriately raised through a habeas corpus proceeding. (*People v. Carrasco, supra,* 59 Cal.4th at pp. 980-981; *People v. Lopez, supra,* 42 Cal.4th at p. 972; *People v. Jones* (2003) 30 Cal.4th 1084, 1105.)[4]

## DISPOSITION

The judgment is affirmed.

DILLON, J.*

We concur:

PERLUSS, P. J.          FEUER, J.

---

[4] We are not suggesting that Bull is entitled to relief in a habeas corpus proceeding. Further, although we also recognize the People's position that, given the amendment to section 1001.36, pretrial mental health diversion is no longer available to Bull, we are not reaching the question whether relief potentially available at the time of trial would still be available as a remedy for ineffective assistance of counsel.

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.